PHILLIPS v. PHILLIPS.

CANCELLATION OF INSTRUMENTS—DEEDS — FRAUD — PROOF — SUFFICIENCY.

In a suit by a mother against her son to set aside a deed to a farm on the ground that plaintiff did not know or understand what she was doing when she signed said deed, the decree of the court below finding that plaintiff had failed to sustain her allegations and dismissing the

bill with leave to plaintiff to bring supplemental proceed-
ings in case she found it impossible to live on the farm
with defendant, *held*, justified by the record.   FELLOWS,
C. J., and WIEST and BIRD, JJ., dissenting.

Appeal from Sanilac; Beach (Watson), J.   Sub-
mitted January 6, 1922.   (Docket No. 60.)   Decided
July 20, 1922.

Bill by Phebe C. Phillips against Jason Phillips and
another to set aside certain deeds and for an account-
ing.   From a decree dismissing the bill, plaintiff ap-
peals.   Affirmed.

*Elmer H. Groefsema* and *Thomas J. Bresnahan,* for
plaintiff.

*Fred A. Farr,* for defendants.

BIRD, J. (*dissenting*).   Plaintiff is an old lady, 73
years of age.   In September, 1919, she owned a 120-
acre farm situate near Carsonville in Sanilac county.
She and her husband had lived on this farm for nearly
40 years.   They had paid for it and improved it.
The husband died about 4 years ago.   She was the
mother of 7 living children.   One of her invalid boys
lived with her.   In September, 1919, the farm was
under a 5-year lease to a tenant.   Plaintiff was in
poor health.   She was affected with heart trouble.
Neuralgic pains were attacking her face.   She was
displeased with the management of the farm by the
tenant.   She wrote to her son, the defendant, who
was then living in Detroit, advising that she would
like to talk over some business matters with him.   He
came out to see her at once and they talked over
the farm matters and her troubles.   It was finally
agreed between plaintiff and defendant that he should
come and take charge of the farm, live on it, and take
care of her and her son, Judson, and give her $50
a year.   The next morning defendant went to Carson-

ville, arranged with Mr. McCaren to prepare the papers, and soon returned with him. The papers were partially prepared at the farm house. For some reason they got into the automobile and went to the bank to finish them. When they were prepared she signed where they directed her to, and plaintiff, defendant and Judson left at once for home. These papers were made on September 18, 1919, and defendant soon thereafter moved into the home with his family and took charge of affairs. An arrangement was soon perfected whereby the tenant gave up his lease. This left the defendant in absolute possession.

Plaintiff, soon after the papers were signed, learned that she had signed two deeds conveying the 80 and 40 acres to defendant for an expressed consideration of one dollar. The deed to the 40 contained the following clause:

"Said Phebe C. Phillips reserves a life lease of the above described premises for herself and her son, Judson Phillips, the said Phebe C. Phillips and Judson Phillips to have the use and control of the same during the remainder of both their natural lives."

The clause in the deed to the 80 acres was slightly different. It read:

"Said Phebe C. Phillips reserves a life lease on above described premises, she to have the use and control of the same during the remainder of her natural life."

She also learned that she had signed a bill of sale of all the personal farm property, the estimated worth of which was about $1,100. In addition to these three papers she signed a lease of the farm for "one year or as long as the parties are agreeable." The consideration expressed was that "he is to board and clothe and otherwise care for first party, Mrs. Phebe C. Phillips, and her son, Judson Phillips, and he is to occupy the farm with them; he is also to pay her,

as her wants may require, a sum not exceeding $50 per year during the life of this lease."

A still further paper was signed appointing defendant to act for plaintiff in her business matters.

The joint relation of the parties did not continue long. Plaintiff and her son Judson left in February, 1920, and went to Carsonville to reside with other relatives. Plaintiff then filed this bill, claiming that she had never knowingly or understandingly executed the deeds or bill of sale. Considerable testimony was taken at the hearing and at the close the chancellor denied her any relief and dismissed her bill. From that decree she appeals to this court.

The fact that this plaintiff was possessed of a good farm of 120 acres worth in the neighborhood of $10,000, and personal farm property of the value of $1,100, on September 18, 1919, and that she is now living in Carsonville on the charity of others, has prompted us to read this record with more than usual care. As a result of our consideration we are persuaded that plaintiff signed these papers in pursuance of a general understanding with defendant that he should come, take charge of and manage the farm, and that he should have papers drawn so that the other children could not come on and make trouble and drive him off. And that when she signed them she was so seriously affected with heart trouble and neuralgic pains that she was indifferent as to the contents of the papers. The uncontradicted proof shows that she was ill, weak and confined to her bed most of the time. She was so ill and weak that she had to be supported by both sons in getting in and out of the automobile and into the bank when she went to Carsonville to sign the papers. Besides this the proofs fairly show that she is not a strong woman mentally and has very little education. She does not possess much business ability, having been engaged

chiefly during the past years in helping to pay for and improve the farm, and in raising her 7 children. She says she understood defendant was to have a lease, that he was to have papers which would protect him from being interfered with and being driven off by the other children. And this is the paper which stipulates that defendant shall pay her a sum not less than $50 a year, and shall board and clothe her and her son Judson.

But defendant says that when he reached home the day the papers were made he paid her $5,000 in cash. That the money was in 100's, 50's, and 20's. When pressed upon cross-examination he had great difficulty in explaining where he got it. Finally he said he made $2,000 of it betting on the Toledo prize fight. He evidently referred to the Dempsey-Willard fight, but he could not tell the name of either fighter. He could not tell who won, but asserted he bet on the winner. He said several people acted as stake holders, but he could not name one of them. When asked when the fight took place he replied in 1900. He further stated that he had carried the money in his pockets for a month previous to paying it to his mother. He did not name any bank or banks in which it, or any part of it, had been deposited. The mother denied that he had paid her any money except the $50 due on the lease for the first year. On another occasion he let her have $2, and on another 2 cents to send a letter, and she testified that these sums were the only sums he had ever paid her.

The argument is made that Mr. McCaren, cashier of the bank at Carsonville, testified that he read the papers to plaintiff before she signed them. He did so swear, but his testimony is not very helpful aside from this. He admitted that he heard conversations between defendant and his mother at the farm concerning their agreement, but he was unable to give

one word of the conversations which he heard. This inability to give any of the talk between defendant and his mother was doubtless due to the fact that the defendant first saw him and explained to him what papers he wanted prepared. Mr. McCaren doubtless assumed that defendant and his mother understood the matter alike and he went forward and made the papers and got through with it as soon as he could, as a busy man would, without giving the matter much thought. For this reason we do not place as much reliance upon Mr. McCaren's testimony as defendant does.

Upon the whole record we are convinced:

(*a*) That the deeds were made without consideration. We are not impressed with the truthfulness of defendant's story that he paid his mother $5,000 in currency. When it is considered in connection with the fact that he was a man of little or no means, the story is too improbable to be given serious consideration. That plaintiff signed the deeds thinking she was signing such papers as were necessary to protect defendant in his occupation and management of the farm, and that her indifference as to the contents of the papers at the time she signed them was due to her illness and acute neuralgic pains. That a fraud was perpetrated upon her by defendant in her then physical condition, without explaining to her what she was doing. He then stood in a fiduciary relation to his mother and the obligation was upon him to deal openly and frankly with her and to see that she fully understood conveyances of property to himself. For these reasons the deeds should be set aside.

(*b*) The bill of sale should be set aside on the same ground.

(*c*) The lease should be sustained, but it having expired by its own terms should be declared terminated.

(*d*) The appointment of defendant as her agent

should be sustained and stand until revoked by plaintiff.

(e) An accounting should be had before the chancellor. Defendant should be charged the fair value of plaintiff's and Judson's board from the time they left the home; also the $50 a year reserved in the lease. And he should be charged with the fair value of the personal property which he received from plaintiff when he took charge of the farm. On the other hand he should be credited with the $250 paid the tenant (if he paid it from his own funds), and whatever interest he has paid on the $500-mortgage, which was on the place when he came there. He should also be credited with such farm work as he may have done the present year. Such other sums as shall appear equitable to the chancellor should be charged to or credited to defendant's account. The date of giving plaintiff possession of the farm should be fixed by the chancellor. The decree should be reversed, and plaintiff should recover her costs in both courts.

FELLOWS, C. J., and WIEST, J., concurred with BIRD, J.

CLARK, J. The record is nearly if not quite barren of proof to sustain plaintiff's claim that she was mentally incompetent to execute the deeds in question. There is abundant evidence of competency.

The claim that the deeds were procured by fraud and that she did not know of their execution until just before bringing this suit is also refuted by the record. Very soon after the making of the deeds she testified in an action before a circuit court commissioner that she had sold the land to defendant.

The deeds were executed in a bank at Carsonville some distance from plaintiff's home. She testified:

"Q. How did you find out, Mrs. Phillips, that there was a deed?

"A. Why, they told me there was a deed.

"*Q.* When?

"*A.* Why, I guess that same day they fetched me home, or the next day—or something next morning— or sometime—I don't know when.

"*Q.* Did you ever read about it in the paper?

"*A.* Yes; I seen it in the paper."

Mr. McCaren, the banker, a disinterested witness, who prepared the deeds and before whom they were acknowledged and who knew the parties, gave credible testimony indicating that plaintiff fully understood the transaction and the papers executed.

The trial judge found in the decree:

"That the plaintiff has failed to prove or sustain the charges in her bill of complaint, and that the allegations of the answer of the defendants have been sustained and proven, that plaintiff was competent and knew and understood fully what she was doing at the time she made the various deeds complained of. The court having observed plaintiff and her children, one of whom, Jason Phillips, is one of the defendants in this case, throughout the hearing in this case and having heard their testimony, is of the opinion that a neurotic strain exists in said family which accounts for a little of the testimony in said case. All of the principal facts in said case, however, are clearly determined by the testimony of impartial witnesses heard at said hearing."

Defendant Jason's testimony respecting the $5,000, and that of the plaintiff relative to fraud and mental incompetency, are of like character respecting credibility and are explained by the trial judge who based his opinion upon testimony, largely undisputed, of disinterested witnesses.

The finding of the trial judge is clearly sustained by the record.

The decree is affirmed.

SHARPE, MOORE, and STEERE, JJ., concurred with CLARK, J.

The late Justice STONE took no part in this decision.